**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | Case No. 11-42578- MSH |
| LOUCHESCHI LLC | ) | |
| | ) | |
| | ) | |
| Debtor | ) | |
| | ) | |
| JONATHAN GOLDSMITH, TRUSTEE | ) | |
| | ) | |
| Plaintiff | ) | Adversary Proceeding |
| | ) | No. 11-4122 |
| v. | ) | |
| | ) | |
| LBM FINANCIAL, LLC and MARCELLO | ) | |
| MALLEGNI | ) | |
| | ) | |
| Defendants | ) | |

**PROPOSED FINDINGS AND RULINGS ON THE DEFENDANTS' JOINT MOTION**
**FOR SUMMARY JUDGMENT**

LBM Financial, LLC and Marcello Mallegni, the defendants in this adversary proceeding,

seek summary judgment on all counts of a thirteen count complaint[1] initially brought against them

by the debtor, Loucheschi LLC, during the chapter 11 phase of the main case and upon conversion

of the case to chapter 7, taken up by Jonathan Goldsmith, the chapter 7 trustee.[2] For the reasons

---

[1] The counts are titled: tortious interference with contract (count I), misrepresentation (count II), negligent lending (count III), common law fraud (count IV), breach of contract (count V), unfair and deceptive acts and practices under MASS. GEN. LAWS ch. 93A (count VI), breach of covenant of good faith and fair dealing (count VII), usurious lending in violation of MASS. GEN. LAWS ch. 271 (count VIII), equitable subordination (count IX), disallowance of claim per 11 U.S.C. § 502(b)(1) (count X), rescission of notes and guarantees for want of consideration (count XI), rescission of notes as void penalties (count XII) and civil conspiracy (count XIII).

[2] Although the trustee was the real party in interest when the summary judgment motion was filed,

discussed more fully below, pursuant to 28 U.S.C. § 157(c)(1), Fed. R. Bankr. P. 9033(a) and LR,

D. Mass. 206, I hereby submit my proposed findings of fact and conclusions of law recommending

that the defendants' motion for summary judgment be granted.

## Facts

The facts are drawn from the stipulated facts in the parties' joint pretrial statement, from

those facts in the defendants' statement of uncontested facts filed pursuant to this court's local

rule, MLBR 7056.1, which adopts the U.S. district court's local rule, LR, D. Mass 56.1, to which

the trustee has not objected[3] and from the uncontested facts in certain pleadings in this adversary

---

the opposition thereto refers to itself as Loucheschi's opposition. As the right to prosecute the
adversary proceeding passed to the trustee upon his appointment, I will assume that the opposition
was intended to be the trustee's.

[3] While not objecting to specific facts contained in the defendants' statement, the trustee did file a
generalized objection to the defendants' statement of uncontested facts. LR, D. Mass. 56.1
provides in relevant part:

> Motions for summary judgment shall include a concise statement of the material facts of record
> as to which the moving party contends there is no genuine issue to be tried, with page
> references to affidavits, depositions and other documentation. Failure to include such a
> statement constitutes grounds for denial of the motion.… A party opposing the motion shall
> include a concise statement of the material facts of record as to which it is contended that there
> exists a genuine issue to be tried, *with page references to affidavits, depositions and other
> documentation.* Copies of all referenced documentation shall be filed as exhibits to the motion
> or opposition. Material facts of record set forth in the statement required to be served by the
> moving party will be deemed for purposes of the motion to be admitted by opposing parties
> unless controverted by the statement required to be served by opposing parties.… (Emphasis
> added).

The U.S. Court of Appeals for the First Circuit has, on numerous occasions, explained the
importance of compliance with this rule.

> Such rules were inaugurated in response to this court's abiding concern that, without them,
> summary judgment practice could too easily become a game of cat-and-mouse. Such rules
> are designed to function as a means of focusing a district court's attention on what is ─and
> what is not ─genuinely controverted. When complied with, they serve to dispel the
> smokescreen behind which litigants with marginal or unwinnable cases often seek to hide
> [and] greatly reduce the possibility that the district court will fall victim to an ambush.

2

proceeding and the main bankruptcy case.

On or about October 8, 2004, Louis J. Cheschi Jr. and Peter Belli, Trustees of

Bell-Ches Realty Trust ("Bell-Ches"), acquired Cape Cod oceanfront property located at 9 Chase

Avenue in Dennis, Massachusetts (the "Property") from LJB Realty, LLC.[4] They had been

introduced to the Property by Mr. Mallegni.[5] Bell-Ches' intention was to demolish an existing

motel and construct an 8-unit residential condominium (the "Project") at the Property.[6] Prior to

---

Given the vital purpose that such rules serve, litigants ignore them at their peril. In the
event that a party opposing summary judgment fails to act in accordance with the rigors
that such a rule imposes, a district court is free, in the exercise of its sound discretion, to
accept the moving party's facts as stated.

We can hardly add to this admonishment but, at the risk of being redundant, we say again
that parties are required to straightforwardly comply with the dictates of local rules such as
Local Rule 56, and to state clearly and concisely the facts claimed to be undisputed or
disputed, or qualified, and the record evidence supporting those claims.… Local Rule 56 is
intended to prevent parties from shifting to the district court the burden of sifting through
the inevitable mountain of information generated by discovery in search of relevant
material…[and prevent] the district court [from] grop[ing] unaided for factual needles in a
documentary haystack.

*Rios-Jimenez v. Principi*, 520 F.3d 31, 38 -39 (1st Cir. 2008) (internal quotation marks and
citations omitted).

Under LR, D. Mass 56.1 and the case law interpreting it, a party's general objection to a
statement of undisputed facts is not sufficient to rebut those facts supported by citations to the
record and documents which have been authenticated. *DiMare v. Amerioquest Mortgage
Company (In re DiMare)*, 462 B.R. 283, 290 (Bankr. D. Mass. 2011). The trustee's general
objection, therefore, is ineffective.

[4] Joint pretrial memorandum statement of admitted facts ("Admitted Facts") and exhibit 10 to the
affidavit of Philip Coppinger ("Coppinger affidavit"). The Admitted Facts are not set out in
numbered paragraphs.

[5] Deposition of Mr. Cheschi, attached as exhibit 3 to the Coppinger affidavit, at pp. 49 and 51.

[6] Admitted Facts.

3

acquiring the Property, Mr. Cheschi had managed approximately ten residential construction projects for realty trusts in which he held ownership interests.[7] Bell-Ches was represented by an attorney who assisted in negotiating the purchase and sale agreement for the Property.[8]

The status of governmental permitting for the Project plays a central role in the parties' dispute. Mr. Cheschi testified at his deposition that prior to Bell- Ches' acquisition and indeed as an inducement for its acquisition, Mr. Mallegni had led him to believe that all of the permits and licenses necessary to develop the Project were in place, when in fact they were not.[9] Mr. Cheschi testified that it was not until after the closing on the Property that he investigated and learned the true status of the permits.[10] The record, however, disproves Mr. Cheschi's version of the facts. In the same deposition where he testified that he was unaware until after the closing that the permits were not in place, Mr. Cheschi testified he learned of the status of the permits on October 6, 2008, two days before the closing.[11] Sometime subsequent to the execution of a handwritten agreement dated May 20, 2004, between Bell-Ches and LJB outlining the terms for the sale and purchase of the Property, it became necessary for Messers. Cheschi and Belli to bring suit against LJB in state court to compel LJB to consummate the sale. In an affidavit dated July 9, 2004, filed in that suit in

---

[7] Cheschi deposition at pp.11 and 13.

[8] *Id.* at pp. 23-24.

[9] *Id.* at pp. 34-35.

[10] *Id.* at p. 36.

[11] *Id.* at p. 47.

support of a motion for a *lis pendens*,[12] Mr. Cheschi conceded that at the time he and Mr. Belli

entered into the agreement with LJB, permitting for the Project had not yet occurred.

> 12. I and Peter M. Belli relied upon the Agreement of May 20, 2004.  In reliance upon that
> Agreement, we applied for and was [sic] granted a purchase money mortgage. We retained
> a local attorney to follow through with the local Planning Board and Zoning Board to
> obtain all necessary permits to raze the building and plan the eight unit development. We
> further obtained the current plans prepared by the Engineer which were delivered to us and
> to finalize the construction of the eight unit development.

Mr. Cheschi later testified at his deposition that in July 2004, he retained an attorney, who

apparently also represented the seller of the Property, to assist in obtaining the needed permits.[13]

In addition, the formal purchase and sale agreement between LBJ and Messers. Belli and Cheschi,

dated September 27, 2004,[14] provides in part:

> 29. The Seller will assist as necessary to help the Buyer finalize plans and obtain permits
> for the demolition of the motel and construction for the 8 townhouse units.

Mr. Cheschi's inaccurate testimony may be explained in part, but certainly not excused, by his

admission during testimony at the claims estimation hearing as well as at his deposition that it was

not his habit to read documents before signing them.[15]

The acquisition of the Property by Bell-Ches was financed by defendant, LBM, with a loan

in the original principal amount of $1,900,000.00 (the "Acquisition Loan"). Bell-Ches paid

---

[12] Exhibit 6 to Coppinger affidavit. The May 20, 2004 agreement refers to an undated, handwritten
agreement signed by Messers. Belli and Cheschi and the managing member of LBJ. The May 20,
2004 agreement called for the parties to enter into a further mutually agreeable purchase and sale
agreement which was executed on September 27, 2004.

[13] Cheschi deposition at pp 39-40.

[14] Exhibit 7 to the Coppinger affidavit.

[15] Cheschi deposition at pp 32-34.

$137,392.29 in points and prepaid interest in connection with the Acquisition Loan.[16] Loucheschi, LLC, the chapter 7 debtor in the main case and Bell-Ches' successor-in-interest on the Project, made a total of $94,763.54 in payments on the Acquisition Loan.[17]

On or about August 9, 2006, Bell-Ches entered into a loan agreement with LBM, pursuant to which LBM agreed to lend Bell-Ches $4,540,000.00 to refinance the Acquisition Loan and to fund the construction of the Project (the "Construction Loan").[18] The loan documents in connection with the Construction Loan included a loan commitment, a promissory note, a mortgage and security agreement encumbering the Property,[19] a construction loan agreement and the personal guaranties of Louis J. Cheschi, Jr. and Peter Belli, Loucheschi's principals.[20] The Construction Loan was due and payable in full on August 9, 2007.[21] Bell-Ches paid another $181,600.00 to LBM in points in connection with the Construction Loan.[22]

---

[16] Admitted Facts.

[17] *Id.*

[18] *Id.*

[19] This mortgage was the subject of a recent decision and order in this proceeding denying the trustee's motion to amend the complaint to add a count that the mortgage was discharged pursuant to MASS. GEN. LAWS ch. 260, § 33, commonly referred to as the obsolete mortgage statute. *Goldsmith v. LBM Financial, LLC (In re Loucheschi, LLC)*, ─B.R.─, 11-4122, 2013 WL 3788485 (Bankr. D. Mass. July 19, 2013).

[20] Admitted Facts. Mr. Belli is now deceased.

[21] August 9, 2006 promissory note attached as exhibit 14 to the Coppinger affidavit.

[22] Admitted Facts.

Using proceeds from the Construction Loan, Bell-Ches paid LBM $2,355,469.50 to pay off the Acquisition Loan. This sum consisted of $1,900,000.00 in principal and $455,469.50 in points and interest.[23]

Between August 9, 2006 and August 8, 2008, which was almost one year after the maturity date of the Construction Loan, LBM made advances from the loan proceeds totaling $3,912,326.73, including the aforementioned payoff of the Acquisition Loan and the payoff of at least one other loan to Mr. Cheschi in the amount of $69,775.61 in connection with another project.[24] As of August 25, 2008, LBM claimed that the balance due on the Construction Loan was $5,293,413.48, consisting of the $3,912,326.73 in disbursed funds plus $1,381,086.75 in points, interest and fees.[25] The parties agree that in August 2008, LBM ceased advancing funds from the Construction Loan,[26] although Mr. Cheschi testified that in August 2007, Mr. Mallegni told him that he intended to shut down the Project because LBM was out of money and needed to raise additional funds from LBM's investors.[27]

On or about April 13, 2006, Bell-Ches entered into a contract with Lacourse Construction Co., Inc. ("Lacourse") for the construction of the Project. Lacourse served as general contractor on the Project from July, 2006 through March 30, 2007 when Lacourse stopped working.[28] On or

---

[23] *Id.*

[24] Admitted Facts.

[25] *Id.*

[26] *Id.*

[27] Cheschi deposition at 164.

[28] *Id.*

about April 27, 2007, Bell-Ches entered into a contract with New American Builders, LLC to continue construction of the Project.

In May or June 2010, LBM made an entry onto the Property for the purpose of foreclosing its mortgage pursuant to MASS. GEN. LAWS ch. 244, §§ 1and 2 and recorded a certificate of entry in the Barnstable County Registry of Deeds. LBM subsequently scheduled a foreclosure sale of the Property for June 15, 2011.

On or about June 15, 2011, Bell-Ches transferred title to the Property to Loucheschi, LLC, a limited liability company owned by Messers. Cheschi and Belli. On the same day, Loucheschi filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code commencing the main case. On September 15, 2011, Loucheschi and Messers. Cheschi and Belli filed the complaint commencing this adversary proceeding against LBM and Messers. Mallegni and Massad. The complaint has been dismissed with respect to the claims of Messers. Cheschi and Belli. Mr. Massad has been dismissed as a defendant.

On October 31, 2011, LBM filed a proof of claim in the main case asserting a secured claim in the amount of $5,640,365.65. Loucheschi objected to the claim, incorporating by reference its claims against LBM asserted in this adversary proceeding. LBM then sought estimation of its claim to enable it to vote to accept or reject a plan of reorganization proposed by Loucheschi. After an evidentiary hearing I ruled that "for the purpose of determining the confirmability of Loucheschi's chapter 11 plan of reorganization, I estimate LBM's claim as a secured claim in the amount of $3,921,126.73." *In re Loucheschi,* LLC, 471 B.R. 777, 783 (Bankr. D. Mass. 2012).

As Loucheschi was unable to obtain confirmation of its proposed plan of reorganization, on June 18, 2012, the main case was converted to chapter 7. Mr. Goldsmith was appointed the chapter 7 trustee and intervened as successor plaintiff in this adversary proceeding.

### Jurisdiction

All counts of the complaint, save count IX seeking equitable subordination of LBM's claim under Bankruptcy Code § 510(c)(1) and count X seeking disallowance of LBM's claim under Bankruptcy Code § 502, assert claims against LBM that are related to Lucheschi's bankruptcy case but do not arise in or under that case. In their answer to the complaint the defendants concede that counts IX and X are core claims within the meaning of 28 U.S.C. § 157(b) in connection with which a bankruptcy court may issue a final order. They maintain, however, that the remaining counts are non-core within the meaning of 28 U.S.C. §157(c)(1). The defendants have not consented to my issuing final orders on the non-core counts.

Contradicting their answer to the complaint, in a memorandum in support of their motion for summary judgment the defendants argue that all the counts in the complaint are core because they all constitute counterclaims to LBM's proof of claim pursuant to 28 U.S.C. § 157(b)(2)(C). The purpose of this about-face was to enable defendants to object to the bankruptcy court's authority to adjudicate any of the counts of the complaint based on the U.S. Supreme Court's decision in *Stern v. Marshall*, 131 S.Ct. 1594, 2600-01 (2011), which held § 157(b)(2)(C) unconstitutional to the extent it conferred the judicial power of the United States on bankruptcy judges who lack life tenure and protection from salary reduction in matters involving state law counterclaims to proofs of claim that would not necessarily be resolved in the claims allowance process. Putting aside the question whether defendants should be held to the position taken in their

answer, their attempt to re-characterize all the counts in the complaint as counterclaims to LBM's

proof of claim is misplaced. First of all, when the complaint was filed LBM had not yet even filed

its proof of claim. Indeed, Mr. Mallegni has never filed a proof of claim. Apart from counts IX and

X, which the parties concede are core, all the counts in the complaint are affirmative claims raising

a panoply of non-bankruptcy causes of action against LBM and Mr. Mallegni. They are classic

non-core claims related to the bankruptcy case which, absent consent of all the parties to my

entering final orders, requires that I submit proposed findings and rulings to the district court

pursuant to 28 U.S.C § 157(c)(1). In light of the defendants' refusal to so consent, I will issue

proposed findings and rulings to the district court on the non-core counts of the complaint.

This by the way would be the result even if I were to accept the defendants' change of

heart. Our U.S. district court has issued a local rule in response to *Stern* which provides:

> If a bankruptcy judge determines that entry of a final order or judgment by a bankruptcy
> judge would not be consistent with Article III of the United States Constitution in a
> particular proceeding referred under L.R. 201 and determined to be a core matter under 28
> U.S.C. § 157, the bankruptcy judge shall hear the proceeding and submit proposed findings
> of fact and conclusions of law to the district court made in compliance with Fed. R. Civ. P.
> 52(a)(1) in the form of findings and conclusions stated on the record or in an opinion or
> memorandum of decision.   LR, D. Mass. 206

In light of the fact that I am issuing proposed findings and rulings to the district court on the 11

non-core counts of the complaint I will exercise discretion and based on the LR, D. Mass. 206 will

issue proposed findings and rulings on counts IX and X as well.

### The Summary Judgment Standard

Summary judgment is appropriate only if "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) made

applicable by Fed. R. Bankr. P. 7056. A "genuine" dispute "is one supported by such evidence that

a reasonable jury, drawing favorable inferences, could resolve it in favor of the nonmoving party.

10

Material facts are those having the potential to affect the outcome of the suit under the applicable law." *In re McCabe Group,* 424 B.R. 1, 4 (Bankr. D. Mass. 2010) (internal citations and footnotes omitted). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the moving party establishes that there are no disputed material facts, "the nonmoving party must establish a trial-worthy issue by presenting enough *competent* evidence to enable a finding favorable to the nonmoving party." *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir. 1993) (emphasis added). "The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990). Affidavits in support of or in opposition to summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1). In other words, a court must not consider evidence that would be inadmissible at trial. *Finn v. Consolidated Bail Corp.*, 782 F.2d 13, 16-17 (1st Cir. 1986). "Mere allegations, or conjecture, unsupported in the record, are insufficient to raise a genuine issue of material fact." *August v. Offices Unlimited, Inc.*, 981 F.2d 576, 580 (1st Cir. 1992).

### Discussion

### Counts I, II, III, IV, VI, VIII and XIII – Tort and Consumer Protection and the Statute of Limitations

The defendants seek summary judgment on counts I, II, III, IV, VI, VIII and XIII of the complaint as time-barred by the applicable statutes of limitations. "The essential nature of the right asserted determines the appropriate statute of limitations." *Nantucket v. Beinecke,* 379 Mass. 345, 347, 398 N.E.2d 458 (1979). Five counts of the complaint sound in tort and thus are subject to a three year statute of limitations under MASS. GEN. LAWS ch. 260, § 2A. Counts I (tortious interference with contract), II (misrepresentation), III (negligent lending), IV (common law fraud), and XIII (civil conspiracy) all fall within the three year limitation period. Both counts VI and VIII allege consumer protection type claims which must be brought within four years of their accrual.[29] MASS. GEN. LAWS ch. 260, § 5A; *Micera v. Neworld Bank,* 412 Mass. 728, 732, 592 N.E.2d 1294, 1297 (1992).

Count I, alleging tortious interference with a contract is based upon assertions in the complaint, echoed in the trustee's opposition to summary judgment, that the defendants (but really LBM) refused to pay Lacourse for construction services which, according to the trustee, for all intents and purposes was the equivalent of the defendants' firing Lacourse. But those alleged actions occurred no later than March 30, 2007, when Lacourse walked off the Project. It is too late to assert a claim in this proceeding based on interference with the Lacourse contract. that occurred more than three years prior to Loucheschi's bankruptcy filing on June 15, 2011.

Count II, alleging misrepresentation, and count IV alleging common law fraud, even

---

[29] The usury statute has been characterized as a consumer protection statute. . *Micera v. Neworld Bank*, 412 Mass. 728, 732, 592 N.E.2d 1294, 1297 (1992). This characterization would seem to hold true even in the commercial lending context.

12

assuming they have been pled with the required specificity,[30] are based upon a claim that the

defendants misrepresented the status of the permits for the Project thereby misleading Bell-Ches

into purchasing the Property and taking out the Acquisition Loan in 2004. Putting aside the

evidence that supports a finding that Mr. Cheschi was well aware of the absence of the permits

prior to the closing on the Property, a fact the trustee concedes in his opposition to summary

judgment,[31] these claims arose, according to Mr. Cheschi's deposition testimony, at the latest by

October 6, 2004 when he testified he was made aware that the permits were not in place. They are

thus barred by the three year statute of limitations. Alternatively, to the extent these counts are

based on the trustee's assertions set forth in the complaint and Mr. Cheschi's deposition that the

defendants misrepresented their ability to fund the construction of the Project, Bell-Ches or

Loucheschi knew of the alleged misrepresentation by August 2007, when Mr. Cheschi claims Mr.

---

[30] The allegations that the defendants made "numerous other misrepresentations on which the Plaintiff relied to its detriment" places the burden on me to parse the record to piece together a case for misrepresentation. I decline to undertake that task.

[31] The trustee argues in his opposition to summary judgment that the timing of Loucheschi's (which I take to be a reference to Bell-Ches) learning of the lack of permits and whether it changed its position in view of the misrepresentation of the status of the permits are disputed facts. Putting aside that the trustee has presented no competent evidence of such disputes, I reiterate that the record indicates Mr. Cheschi learned of the true status of the permitting process months in advance of the closing and indeed took affirmative steps to force the sale of the Property to Bell-Ches. His argument that because Mr. Cheschi claims to have turned a blind eye to the true status of the permits, he has a claim for misrepresentation that withstands summary judgment is insufficient to establish a necessary element of his claim, namely the reasonable or justifiable reliance on the alleged statements. *Rodi v. Southern New England School of Law,* 532 F.3d 11, 15, 17 (1st Cir.2008) (plaintiff's reliance on alleged statements by dean that the school would be accredited before plaintiff's graduation described as both unreasonable and unjustified); *see also Yorke v. Taylor*, 332 Mass. 368, 124 N.E.2d 912, 916 (1955) (reliance cannot be reasonable when the alleged misrepresentation is "palpably false"); Restatement (Second) of Torts § 541 ("The recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him."). Without proof of this necessary element, the claim must fail.

Mallegni told him that LBM intended to stop funding the Project allegedly because it had run out

funds, again making the claims time-barred.[32]

The claim in count III for negligent lending would have arisen at the time of the

Acquisition Loan in 2004 or, at the latest, with the Construction Loan in 2006,[33] both beyond the

three year statute of limitations.

Count XIII alleges civil conspiracy. Like the other counts in the complaint, it incorporates

all the allegations in the complaint's preceding paragraphs, pleading the cause of action in a most

cursory fashion, leaving the reader to uncover the nature of the conspiracy.[34] Without accepting

the trustee's invitation to do so, I will nevertheless address the statute of limitations question.

Massachusetts recognizes two varieties of common law civil conspiracy: coercive

conspiracy sometimes referred to a "true conspiracy," where there is no independent basis for

imposing tort liability but where by "mere force of numbers acting in unison the defendants

exercised some peculiar power of coercion on the plaintiff which any individual standing in a like

relation to the plaintiff would not have had," *Grant v. John Hancock Mut. Life Ins. Co.*, 183 F.

Supp.2d 344, 362-63 (D. Mass. 2002) (internal citation and quotation marks omitted); and

concerted action in tort where liability is imposed on one individual for the tort of another. *Kurker*

---

[32] *See* the Complaint at ¶ 40 ("As soon as the building was weather tight in August 2007, Mallegni informed Cheschi that he was shutting down the project because LBM was out of money and would need to go out and raise additional funds from investors before he could fund any more of the project."). See also Cheschi deposition at 164.

[33] In light of the statute of limitations bar, I make no finding as to whether such a tort is recognized in Massachusetts. *Lopez v. Mortgage Electronic Registration Systems, Inc. (In re Lopez)*, 486 B.R. 221, 232 (Bankr. D. Mass. 2013).

[34] Count XIII alleges only that the "Defendants conspired with each other with improper and unlawful motives to cause harm to the Plaintiff."

*v. Hill,* 44 Mass. App. Ct. 184, 188–89, 689 N.E.2d 833 (1998). *See also Haemonetics v. Dupre*, 238 B.R. 224, 228 (D. Mass. 1999).

The trustee's opposition to summary judgment suggests that he is alleging conspiracy by concerted action in tort, namely that Mr. Mallegni in concert with Mr. Massad planned a "loan to own" scheme whereby their lending activities through LBM were merely a device for acquiring ownership of the Project.[35] Aside from the fact that there is nothing in the record to support this claim,[36] as a tort that appears based on LBM's refusal to fund the Project as a way of creating Bell-Ches' default it would be subject to a three year limitation period. *Cf. Sexual Minorities Uganda v. Lively*, − F. Supp.2d −, 2013 WL 4130756, at *24 (D. Mass. August 14, 2013). "For a common law civil conspiracy claim, the cause of action accrues at the time the plaintiff is injured, or when he discovers or reasonably should have discovered the cause of the injury" *Id.* at, *24 (internal citations omitted). Here the alleged scheme should have been clear by no later than 2007, when LBM allegedly forced Lacourse off the Project by refusing to fund payment of Lacourse's invoices and informed Bell-Ches that it was out of money.

Counts VI and VIII are the consumer protection type counts. The complaint states that

---

[35] The opposition states "Mallegni in concert with former defendant, David A. Massad, and defendant LBM, acted in concert to put a permanent end to this Project and embarked on a plan to take it over. Repeated representations that additional funding would be forthcoming to complete the Project after LaCourse's bankruptcy never produced any results."

[36] The trustee cites to Mr. Cheschi's deposition at pages 180-188. Although he has not provided an authenticated copy of the transcript and indeed has not supplied pages 186-188, a full copy of Mr. Cheschi's deposition transcript is attached as exhibit 3 to the Coppinger affidavit in support of summary judgment. Mr. Cheschi's testimony on pages 180-188 was that Mr. Massad, whom Mr. Cheschi described as the owner of LBM and the one directing what was to be done with respect to the Project, repeatedly told Mr. Cheschi sometime in 2007 or 2008 that the contractor would be paid and the Project restarted but that Mr. Massad failed to follow through on those representations. There is nothing in Mr. Cheschi's testimony that suggests that these alleged misrepresentations were part of a conspiracy between Mr. Massad and Mr. Mallegni.

15

count VI, asserting claims under MASS. GEN. LAWS ch. 93A, is based upon the defendants' alleged

breach of contract (although, as noted, only LBM was a party to the contracts), misrepresentations,

fraud, usurious lending, negligence (which is plead as negligent lending), interference with a

business relationship (which is not pled as such), and unjust enrichment.[37] Count VIII, alleging

usurious lending, is predicated upon the Acquisition Loan's charging interest in excess of twenty

percent per annum. All of these alleged activites, with the exception, as discussed below, of any

usurious interest charged after June 15, 2007, occurred outside of the relevant four year limitations

period.

Bankruptcy Code § 108(a) extends the time for a trustee to assert claims for which the

statute of limitations has not yet expired when the bankruptcy petition is filed to the later of (i) the

end of the limitations period or (ii) two years after the order for relief.[38] The bankruptcy tolling

statute is unavailable to the trustee here because the relevant statute of limitations for all the tort

and consumer protection type counts expired before Loucheschi's bankruptcy filing.

---

[37] As with the other counts, the 93A claim incorporates all of the preceding paragraphs of the
complaint and alleges that enumerated tort and contract claims establish that the defendants'
actions were unfair and deceptive.

[38] Bankruptcy Code § 108(a) provides:

> If applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an
> agreement fixes a period within which the debtor may commence an action, and such
> period has not expired before the date of the filing of the petition, the trustee may
> commence such action only before the later of—
>
> (1) the end of such period, including any suspension of such period occurring on or after
> the commencement of the case; or
> (2) two years after the order for relief.

16

The trustee does not dispute the applicable limitations periods for all the tort and consumer protection type claims but in his opposition to the defendants' summary judgment motion argues that the conduct giving rise to the claims continued during the period 2007 to 2010 so the claims are not time barred. Although the trustee does not offer support for this position it appears to be based upon paragraph 43 of the complaint which alleges that:

> From some time in late 2007 until 2010, LBM sought no replacement contractor, offered no solution to the impasse, but continued to add interest to the unpaid Second Note all the while never sending a single invoice or statement to Bell-Ches, Loucheschi or Belli.

The trustee appears to be asserting the inaptly named "continuing violation" doctrine.

> Like too many legal doctrines, the "continuing violation" doctrine is misnamed. Suppose that year after year, for ten years, your employer pays you less than the minimum wage. That is a continuing violation. But it does not entitle you to wait until year 15 (assuming for the sake of illustration that the statute of limitations is five years) and then sue not only for the wages you should have received in year 10 but also for the wages you should have received in years 1 through 9. The statute of limitations begins to run upon injury (or, as is standardly the case with federal claims, upon discovery of the injury) and is not tolled by subsequent injuries....
>
> The office of the misnamed doctrine is to allow suit to be delayed until a series of wrongful acts blossoms into an injury on which suit can be brought.... It is thus a doctrine not about a continuing, but about a cumulative, violation.
>
> *Limestone Development Corp. v. Village of Lemont, Ill.,* 520 F.3d 797, 801 (7th Cir.2008). *See also Perez–Sanchez v. Public Building Authority,* 531 F.3d 104, 107 (1st Cir.2008) ("Although the name of the doctrine may sound auspicious for late-filing plaintiffs, it does *not* allow a plaintiff to avoid filing suit so long as some person continues to violate his rights."); *Roemmich v. Eagle Eye Development, LLC,* 526 F.3d 343, 350 (8th Cir.2008) ("A series of wrongs is only continuous for the purposes of this doctrine ... when no single incident in a chain of tortious activity can fairly or realistically be identified as the cause of significant harm" (Internal quotation marks and citation omitted)). As the *Limestone* court explained, the doctrine is typically applied in workplace harassment cases where each offensive word or behavior, in isolation, may not be actionable, but viewed together establish a claim. *Cf. Cajigas v. Banco de Ponce,* 741 F.2d 464, 469 (1st Cir.1984) (noting in an employment discrimination context, "a court evaluating a 'continuing violation' argument must distinguish between a continuing violation and the continuing effects of a prior, yet discrete and no longer existent, discriminatory act.").

17

*Goldsmith v. Massad (In re Fiorillo),* 494 B.R. 119, 152 -153 (Bankr. D. Mass. 2013).

There are insurmountable obstacles to the trustee's position. First, the complaint is not

verified and arguments of counsel, whether oral or written, are not evidence. *Braunstein v. Sanders*

*(In re Muhammad),* 10-1258, 2011 WL 2224410, at *3 (Bankr. D. Mass. June 7, 2011). Thus the

trustee has failed to provide evidence of a material factual dispute. If he were able to overcome this

hurdle, his attempt to consolidate into a single paragraph of the complaint facts to support counts I,

II, III, IV, VI, VIII and XIII is ineffective as the facts recited in each count specifically do not

support a conclusion that all of the actions complained of continued into 2010. And even if they

did, with the exception of the usury count, discussed below, "the statute of limitations starts to run

when an event or events have occurred that were reasonably likely to put the plaintiff on notice that

someone may have caused her injury… The plaintiff need not know the full extent of the injury

before the statute starts to run." *Bowen v. EH Lilly & Co.,* 408 Mass. 204, 207, 557 N.E.2d 739

(1990). Thus, the fact that conduct, or more precisely the effect of LBM's inaction as pled in

paragraph 43 of the complaint continued into 2010 does not insulate a claim from a statute of

limitations defense if the conduct was merely a continuation of conduct that occurred years before,

as appears to have been the case here.

The trustee is correct to a degree with respect to his usury claim. This is not due to the

continuing violation doctrine but because under Massachusetts law each payment of usurious

interest represents a separate violation of law and carries its own limitation period. Each payment

of interest made in violation of the usury statute begins a new limitations period with respect to

that payment. *Micera*, 412 Mass. at 733, 592 N.E.2d at 1297.

Summary judgment should, therefore, enter for the defendants on counts I, II, III, IV and

18

XIII of the complaint as well as on counts VI and VIII except to the extent they assert claims based

on usurious loan payments made after June 15, 2007. The usury claim will be the subject of

additional discussion below.

**Counts V and VII –Breach of Contract**

Count V asserts a breach of contract claim that is premised on the assumption that under

the agreements between the parties LBM obligated itself to fund construction of the Project

through completion and sale of the condominium units. The loan documents, however, state

otherwise. The loan commitment for the Construction Loan was for a sum certain but advances

were conditioned upon Bell-Ches' attaining construction milestones. Mr. Lacourse testified in his

deposition that before honoring any requisition for payment, LBM would require verification that

the work for which payment was being sought had been completed in accordance with all plans

and specifications. If the work was not performed correctly, the invoice was not paid.[39]  The

trustee has produced no evidence to support his position that the defendants breached the

construction agreements when they ceased funding the Project and thus has presented no disputed

issue of fact.

As a companion to his breach of contract claim, the trustee seeks recovery in count VII for

the defendants' alleged breach of the covenant of good faith and fair dealing. As numerous courts

have recognized:

> Every contract implies good faith and fair dealing between the parties to it. The covenant of
> good faith and fair dealing requires that neither party shall do anything that will have the
> effect of destroying or injuring the right of the other party to the fruits of the contract.

---

[39]  Deposition of Kenneth Lacourse at pp. 39-40, attached as exhibit 4 to Coppinger affidavit.

However, the scope of the covenant is only as broad as the contract that governs the
particular relationship. It cannot create rights and duties not otherwise provided for in the
existing contractual relationship, as the purpose of the covenant is to guarantee that the
parties remain faithful to the intended and agreed expectations of the parties in their
performance.

*T.W. Nickerson, Inc. v. Fleet Nat. Bank*, 456 Mass. 562, 570, 924 N.E.2d 696, 703-04 (2010)

(internal citations and quotation marks omitted).

Count VII is broadly drafted to include "all contracts involved in this complaint." The

complaint, however, refers to contracts, such as the one between Bell-Ches and Lacourse, to which

the defendants were not even parties. The alleged breach of the covenant of good faith and fair

dealing certainly does not apply to that agreement. Furthermore, Mr. Mallegni was not a party to

the contracts between Bell-Ches and LBM and more importantly, as was the case with respect to

count V, the trustee offers no disputed facts regarding the contracts to justify denying the

defendants' motion for summary judgment with respect to the alleged breach of good faith and fair

dealing. Rather the trustee requests that I take judicial notice of my May 30, 2012 decision which

according to the trustee "clearly found LBM's actions to be in bad faith." The trustee reads too

much into that decision which found:

> The reason LBM ceased funding the construction loan in August of 2008 is a matter of
> dispute. LBM claims it is because construction on the project had stopped and the borrower
> had stopped submitting construction requisitions. LBM also claimed that it was prevented
> from advancing new funds because of an injunction issued in November, 2007 in an
> unrelated state court lawsuit to which its borrower was subject. Loucheschi claims that
> construction stopped because LBM refused to timely honor requisitions to pay
> Loucheschi's general contractor, Lacourse Construction Co., Inc., who in the spring of
> 2007 walked off the job leaving the project without a general contractor. Even though
> Lacourse exited the job in early 2007, however, construction continued through the fall of
> 2007 to the point where the building shell was left weather-tight. LBM funded all
> construction requisitions for this work as well as for additional project related expenses in
> 2008.

*Loucheschi,* 471 B.R. at 781. These findings are at best inconclusive.

20

The trustee also argues that "evidence… at trial will conclusively prove" the breach of the covenant of good faith and fair dealing. But the time for the trustee to come forward with evidence in order to get to trial is now. He has failed to do so.

Summary judgment should enter for the defendants on counts V and VII of the complaint.

**Count VIII - Usury**

The trustee's claim in count VIII of the complaint for violation of chapter 93A is largely dependent upon his claim that the Construction Loan violated the Massachusetts usury law.

In my May 30, 2012, decision estimating LBM's claim for purposes of its voting on Loucheschi' plan of reorganization, I ruled that the interest charged in connection with the Construction Loan was usurious because it exceeded twenty percent per annum and LBM had failed to file notice of its intent to charge more than twenty percent interest with the Massachusetts Attorney General as required by MASS. GEN. LAWS ch. 271, § 49(d). LBM now asserts that it had indeed filed such a notice with the Attorney General and has provided a copy dated January 6, 2006, bearing the Attorney General's acknowledgement of receipt on January 11, 2006. Because such filing is an absolute defense to a usury claim, *Cannarozzi v. Fiumara,* 371 F.3d 1 (1st Cir. 2004), in the defendants' view the trustee is not entitled to any relief with respect to his usury count.[40] The trustee does not dispute that LBM filed the required notice with the Attorney General's office but argues that my previous finding that the Construction Loan was usurious must be given *res judicata* effect.

Because the estimation of LBM's claim was litigated in this court, the *res judicata* treatment of rulings in that matter is governed by federal law. *Iannochino v. Rodalakis,* 242 F.3d

---

[40] Exhibit 32 to Coppinger affidavit.

36, 41 (1st Cir. 2001). "Under federal law, a final judgment on the merits of an action precludes the

parties from relitigating claims that were raised or could have been raised in that action. For a

claim to be precluded, there must be: (1) a final judgment on the merits in an earlier action; (2)

sufficient identity between the causes of action asserted in the earlier and later suits; and (3)

sufficient identity between the parties in the two suits." *Bay State HMO Management, Inc. v.*

*Tingley Systems, Inc*., 181 F.3d 174, 177 (1st Cir. 1999) (internal citations omitted). "A decision is

final if it ends the litigation on the merits and leaves nothing for the court to do but execute the

judgment." *Orsini Santos v. Mender (In re Orsini Santos)*, 349 B.R. 762, 768 -769 (B.A.P. 1st Cir.

2006) (citation and internal quotation marks omitted). "[A] bankruptcy court order need not

resolve all of the issues in the proceeding, but it must finally dispose of all the issues pertaining to

a discrete dispute within the larger proceeding." *Perry v. Citizens First Credit Union (In re Perry),*

391 F.3d 282, 285 (1st Cir. 2004). "[A] final judgment, order, or decree entered in a bankruptcy

case includes an order that *conclusively* determines a separable dispute over a creditor's claim or

priority." *Giles World Mktg., Inc. v. Boekamp Mfg., Inc.,* 787 F.2d 746, 748 (1st Cir. 1986)

(emphasis in the original, internal citation and quotation marks omitted). An order allowing or

disallowing a claim is a final, appealable order." *Id.*

    The bankruptcy court's ability to estimate claims derives from either Bankruptcy Code §

502(c) or Fed. R. Bankr. P. 3018. Bankruptcy Code § 502(c) mandates the estimation of a

contingent or unliquidated claim "for purposes of *allowance*… [if] the fixing or liquidation …

would unduly delay the administration of the estate." (Emphasis added). Fed. R. Bankr. P. 3018

provides in pertinent part: "Notwithstanding objection to a claim or interest, the court after notice

and a hearing may temporarily allow the claim or interest in an amount which the court deems

proper for the purpose of accepting or rejecting a plan."

Whether a claim estimation determination under § 502(c) has preclusive effect is a matter

of disagreement among the courts. As the court in *In re A.P.I., Inc.*, 331 B.R. 828, 846 (Bankr. D.

Minn. 2005), noted:

> Some courts hold that the estimation of a claim under § 502(c)(1) has binding effect *per se*
> only for the administration of claims and assets in a bankruptcy case, and does not give rise
> to a fixed and liquidated claim cognizable in any other forum. *E.g., In re Eagle Bus Mfg.,*
> *Inc.,* 158 B.R. 421, 437–438 (S.D.Tex.1993); *In re Teigen,* 228 B.R. 720, 722 (Bankr
> .D.S.D. 1998); *Matter of Interco Inc.,* 137 B.R. 993, 999 (Bankr. E. D. Mo. 1992). Others
> have envisioned an estimation under § 502(c)(1) as having preclusive effect, but have
> recognized the bankruptcy court's power to limit or deny that effect in deference to another
> forum, at the instance of party or parties, or not. *In re Indian Motocycle Co., Inc.,* 261 B.R.
> 800, 808 (1st Cir. BAP 2001); *In re Handy & Harman Refining Group, Inc.,* 262 B.R. 211,
> 215–216 (Bankr. D. Conn. 2001).

The Bankruptcy Appellate Panel for the First Circuit has opined:

> Ordinarily, an estimated claim may have the same preclusive effect as any other order from
> a court of competent jurisdiction, raising the possibility that the bankruptcy court's order
> would invoke res judicata or collateral estoppel on the issue of the amount of the taxes. *See*
> 4 Collier on Bankruptcy ¶ 502.04 [3]. However, we also note that under some
> circumstances an estimated claim may be limited by the court in deference to another
> court's jurisdiction over a matter. *See In re Bicoastal Corp.,* 122 B.R. 771, 774–75 (Bankr.
> M.D. Fla.1990). *See also* 4 Collier on Bankruptcy at ¶ 502.04[3].

*United States of America v. Sterling Consulting Corp. (In re Indian Motocycle Co.)*, 261 B.R. 800,

808 (B.A.P. 1st Cir. 2001) (holding use of § 502(c) estimation procedure governing prepetition

claims for estimation of post-petition taxes was in error).

Unlike § 502(c), Fed. R. Bankr. P. 3018(a) permits only the *temporary* allowance of a

claim, including a disputed claim, for the purpose of voting to accept or reject a chapter 11 plan of

reorganization. Rule 3018's language is a clear indication that claim estimation for the purpose of

voting to accept or reject a plan is temporary and, therefore, not preclusive. Section 502(c)

contains no such limitation, suggesting that estimations of claims to avoid undue delay in the

23

bankruptcy case may indeed have preclusive effect as the panel in *Indian Motocycle* noted.

In its motion requesting estimation of its claim, LBM relied on both Bankruptcy Code § 502(c) and Fed. R. Bankr. P. 3018. My ruling, however, made it clear that the estimation of LBM's claim was "for the purpose of determining the confirmability of Loucheschi's chapter 11 plan of reorganization." This is consistent with the purpose of Rule 3018 which provides for "temporary" allowance. Section 502(c) is not applicable to LBM's claim for plan voting purposes which is why in ruling on LBM's estimation motion I did not rely on it. Consequently, I find that the estimation proceeding was for the temporary allowance of LBM's claim for plan voting purposes and the ruling therein is not preclusive. Accordingly, LBM may introduce for purposes of its motion for summary judgment the fact of its registration of the Construction Loan with the Attorney General's office as an absolute defense to the trustee's usury claim and therefore, summary judgment for the defendants should be granted with respect to count VIII of the complaint.

## Count VI - Violation of MASS. GEN. LAWS ch. 93A

The complaint states that count VI, asserting claims under MASS. GEN. LAWS ch. 93A, is based upon the defendants' alleged breach of contract, misrepresentations, fraud, usurious lending, negligence, interference with a business relationship, and unjust enrichment. A claim under chapter 93A is "neither wholly tortious nor wholly contractual in nature, and is not subject to the traditional limitations of preexisting causes of action, such as tort for fraud and deceit"). *Slaney v. Westwood Auto, Inc.,* 366 Mass. 688, 704, 322 N.E.2d 768, 779 (1975). But there must be some act that rises to the level of a violation. In this respect the Attorney General's regulations are instructive. 20 Mass.Code of Regs. § 3.16 provides:

> Without limiting the scope of any other rule, regulation or statute, an act or practice is a violation of M.G.L. c.93A, § 2 if:

(1) It is oppressive or otherwise unconscionable in any respect; or

(2) Any person or other legal entity subject to this act fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction; or

(3) It fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide the consumers of this Commonwealth protection; or

(4) It violates the Federal Trade Commission Act, the Federal Consumer Credit Protection Act or other Federal consumer protection statutes within the purview of M.G.L. c. 93A, § 2.

While a usury violation is a per se violation of MASS. GEN. LAWS ch. 93A, I have now determined that the loan is not usurious because of LBM's registration with the Attorney General's office. To the extent that the trustee bases his chapter 93A count on LBM's or Mallegni's misrepresentation of the status of the permits prior to Bell-Ches' acquiring the Property, that claim must also fail because as previously noted, the uncontroverted evidence establishes that the absence of permits was known to Bell-Ches and its principals before the purchase of the Property. To the extent that the trustee's chapter 93A claim is premised on LBM's misrepresentation that it would fund the Project to completion, the loan documents themselves contradict the trustee's position. The trustee has provided no basis for a finding that the defendants' explanation as to why they ceased funding the Project is in material dispute. For these reasons, the defendants should be granted summary judgment on count VI of the complaint.

## Count IX - Equitable Subordination

The complaint seeks equitable subordination of the defendants' (but really LBM's) claim under Bankruptcy Code § 510(c)(1)which provides:

25

> Notwithstanding subsections (a) and (b) of this section, after notice and a hearing the court may—
>
> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest….

Equitable subordination of a claim is a remedial rather than a penal doctrine "designed to undo or to offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results." *Butler v. Anderson (In re C.R. Stone Concrete Contractors, Inc.)*, 462 B.R. 6, 28 (Bankr. D. Mass. 2011) (internal citation and quotation marks omitted). Equitable subordination is appropriate if the proponent meets the three-prong test enunciated in *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 700 (5th Cir.1977), and adopted by the U.S. Court of Appeals for the First Circuit in *Capital Bank & Trust Co. v. 604 Columbus Avenue Realty Trust (In re 604 Columbus Ave. Realty Trust)*, 968 F.2d 1332, 1353 (1st Cir. 1992). The test requires that (i) the claimant must have engaged in some type of inequitable conduct, (ii) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant and (iii) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code.

In his opposition to the defendants' motion for summary judgment, in addition to confusing the remedies of subordination and recharacterization,[41] the trustee maintains that

---

[41] As the court in *Aquino v. Black (In re AtlanticRancher, Inc.)*, 279 B.R. 411, 433 (Bankr. D. Mass. 2002), explained:

> [W]hile once considered solely in conjunction with the doctrine of equitable subordination, bankruptcy courts now consider recharacterization a separate cause of action….. As a result, this Court may recharacterize debt as equity in a case in which a creditor has contributed capital to a debtor in the form of a loan, but the loan has the substance and character of an equity contribution.

evidence introduced at the December 2012, claim estimation hearing warrants equitable

subordination. He fails, however, to pinpoint that evidence and I am unable to find any. As the

trustee has offered no evidence to establish that there are facts in dispute which if proven would

warrant equitable subordination of LBM's claim, summary judgment should enter for the

defendants on count IX.

**Count X - Disallowance of Claims pursuant to 11 U.S.C. § 502(b)(1)**

The trustee seeks to have LBM's claim disallowed under Bankruptcy Code § 502(b)(1)

which provides that a claim that is unenforceable under any agreement or nonbankruprcy law is

not allowed. That section does not provide an independent basis for disallowing a claim; it merely

recognizes that bankruptcy law will not permit a claim to be allowed if an agreement or

nonbankruptcy law renders the claim unenforceable. As LBM's claim is exempt from a usury

violation in light of LBM's registration with the Attorney General and the trustee has offered no

other basis for disallowance, summary judgment should enter for the defendants on this count.

**Counts XI and XII - Rescission**

The trustee seeks rescission of the Construction Loan for lack of consideration (count XI)

and as a penalty for the excessive points, fees and interest charged by LBM, all of which the trustee

alleges constitute illegal penalties (count XII).[42]  The trustee's claim for rescission due to lack of

consideration is based on LBM's failure to continue funding the Project, allegedly in breach of the

Construction Agreement. His claim for rescission based on excessive points, fees and interest is an

extension of his usury claim which no longer survives.

---

[42] Although the complaint refers to the "notes," the trustee's opposition to summary judgment
refers to a single note which I understand to be the note for the Construction Loan.

Rescission is an equitable remedy available when a contract has been entered into through "fraud, accident, mistake or some type of grossly inequitable conduct which renders the contract void ab initio." ' *P.L.A.Y., Inc. v. NIKE, Inc.,* 1 F. Supp.2d 60, 65 (D. Mass. 1998) (applying Massachusetts law). "There is ample authority for refusing rescission where there has been only a breach of contract rather than an utter failure of consideration or a repudiation by the party in breach. In the absence of fraud, nothing less than conduct that amounts to an abrogation of the contract, or that goes to the essence of it, or takes away its foundation, can be made a ground for rescission of it by the other party." *Worcester Heritage Soc., Inc. v. Trussell*, 31 Mass. App. Ct. 343, 345, 577 N.E.2d 1009, 1010 (1991) (internal citation and quotation marks omitted).The party seeking rescission bears the burden of pleading factual circumstances which merit such relief. *Coggins v. New England Patriots Football Club, Inc.,* 397 Mass. 525, 492 N.E.2d 1112, 1119–20 (1986). The trustee has not offered evidence that would create a factual dispute as to whether the defendants engaged in fraud or the complete repudiation of the Construction Loan. Consequently, summary judgment should enter for the defendants on counts XI and XII of the complaint.

## Conclusion

For the reasons stated herein, I recommend that the defendants' motion for summary judgment be granted and judgment enter for the defendants on all counts of the complaint.

At Worcester, Massachusetts this 13th day of November, 2013.

By the Court,

_____

Melvin S. Hoffman
U.S. Bankruptcy Judge

Counsel Appearing:   Gary M. Hogan, Esq.
Gilmore, Rees & Carlson, P.C.
Franklin, MA
for plaintiff, Jonathan R. Goldsmith, trustee


Philip F. Coppinger, Esq.
LBM Financial, LLC
Marlborough, MA
for defendants LBM Financial, LLC and Marcello Mallegn